IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge R. Brooke Jackson

Civil Action No 16-cv-02999-RBJ

JANE WILNER, TRUDO LETSCHERT,
ROBERT RUDNICK, and RUSSELL SCHMEISER,
individually and on behalf of all others similarly situated,

    Plaintiffs,

v.

BEHRINGER HARVARD CORDILLERA, LLC,
BEHRINGER HARVARD HOLDINGS, LLC,
ROBERT M. BEHRINGER, and MICHAEL D. COHEN,

    Defendants.

CSMN INVESTMENTS, LLC and CCG MANAGEMENT, LLC,

    Intervenors.

---

### FINDINGS AND CONCLUSIONS RE DENIAL OF PRELIMINARY INJUNCTION

---

Plaintiff's motion for a preliminary injunction was heard on February 16, 2017. At the conclusion of the hearing the Court denied the motion and advised the parties that written findings and conclusions would follow. *See* Fed. R. Civ. P. 52(a)(2).

## BACKGROUND

Cordillera is a resort residential community in Eagle County, Colorado. Plaintiffs are four of the homeowners at Cordillera and are members of the Cordillera Property Owners Association ("CPOA"). Residents such as the plaintiffs have historically had access to a variety

of amenities including golf courses, tennis courts, restaurants, and a 56-room Lodge and Spa ("the Lodge").

Plaintiffs describe the Lodge as a "central amenity to home ownership in Cordillera." Second Amended Complaint, ECF No. 37, at 2. However, the Declaration of Protective Covenants, Conditions, and Restrictions for Cordillera provides that no persons, including members of the CPOA, have a "right" to use the Lodge; that access to it may be restricted or terminated by its owner; and, indeed, that the Lodge may be sold or closed. *See* ECF No 48-1 at ¶¶1.3, 1.23, 1.25, 2.3. These covenants, referred to by the parties as the Cordillera Declaration, were recorded in the Eagle County records in or about 1993, before plaintiffs purchased their lots.

In 2007 defendant Behringer Harvard Cordillera, LLC ("BHC") purchased the Lodge for approximately $36.5 million. Affidavit of Lisa Ross, ECF No. 48-3, at ¶5. However, from the outset of BHC's ownership the Lodge was not profitable. In 2008, for example, the Lodge had a net operating loss of approximately $2.8 million on total income of approximately $5.9 million. The Lodge & Spa at Cordillera Total Income/Net Operating Income/(Loss), Ex. L.

In 2009 BHC formulated a plan that it hoped would turn things around. As a part of the plan BHC proposed an amendment to the Planned Unit Development ("PUD") that governed the uses permitted on the property on which the Lodge sits ("the Lodge Parcel") as well as the uses permitted on an adjacent parcel referred to as "the Village Parcel." The amendment would bring the two parcels together into one unit which would then permit all the uses authorized for the Village Parcel to apply equally to the Lodge Parcel and vice-versa. *See* Letter from Amanda Smith, Otten Johsnon, to Bob Narracci, Planning Manager, Eagle County (Nov. 11, 2009), Ex. D

(transmitting application to modify the PUD); Cordillera Subdivision Eleventh Amended and Restated Planned Unit Development Control Document (Nov. 2009), Ex. E (redlined PUD).

Because this was considered to be a major change in the way the two parcels could potentially be used, approval was required both from the County and the CPOA. Those approvals were obtained, and the new uses were authorized by what has been referred to as the Eleventh Amendment to the PUD. The effect of the amendment was that authorized uses of the Lodge Parcel now included, in addition to its historic use as a lodge and spa, some 33 other possible uses. One of the newly authorized uses was for "Medical Offices/Facilities, limited to clinic and outpatient facilities for non-critical care, including, without limitation, for outpatient plastic surgery and other cosmetic procedures." Ex. E. at 13.

Nevertheless, BHC continued to use the Lodge Parcel for the Lodge and Spa as originally designed and historically used. Ms. Ross, who is the Senior Vice President and Chief Financial Officer of an affiliated Behringer Harvard company, informed the Court that "[s]ince the 2009 modification of the PUD . . . BHC has put millions of dollars into the Lodge hoping to make it profitable." ECF No. 48-3 at ¶5. But occupancy rates did not recover, and memberships in the Lodge steadily declined.[1] The Lodge has generated net operating losses each year through the present time. Ex. L. According to Ms. Ross, the occupancy rates, memberships and ultimately revenues were too low to operate the Lodge profitably. *Id.* at ¶6.

---

[1] It is not clear to me what benefits memberships provided. Mr. Wilner testified that BHC imposed a fee of $1,500 each season to be a member of the Lodge, and that some people paid it because they use the Lodge. But he also testified that you could use the Lodge anyway, just not as a member, and he said that he thought there were discounts involved. In any event, according to Ms. Ross and Exhibit M, from 2013 to the present memberships declined from 206 to 80 (apparently out of approximately 850 households). According to Ms. Ross, two of the four named plaintiffs are not members, and she found no records indicating that any of the four plaintiffs had used the hotel for themselves or guests. Mr. Wilner countered that he and his wife do use the Lodge.

Therefore, BHC put the Lodge up for sale in November 2013. During the next 30 months it received only one offer from a qualified buyer. That was an offer by intervenors CCG Management, LLC and CSMN Investments, LLC (collectively "CCG") to buy the Lodge for $10 million. CCG plans to convert the Lodge into a "residential non-critical care clinic and rehabilitation center for persons recovering from alcoholism, eating disorders, drug addiction, and similar conditions." Affidavit of Noah Nordheimer, President and Manager of the two CCG intervenors, ECF No. 48-4, at ¶4. Mr. Nordheimer describes the project as an "$85 million redevelopment." *Id.* The Lodge will no longer function as a lodge or spa as such. It will be accessible only to persons who are admitted to the facility for treatment and who can pay between $40,000 and $65,000 per 28 days (a short-term, less expensive alternative will apparently also be available). Plaintiffs and other members of the public will not have access to the facility, unless of course they are admitted as paying clients.

Eagle County's Community Development Director confirmed on July 11, 2016 that CCG's intended development and use of the Lodge Parcel was permitted by the Eleventh Amendment to the PUD. The Cordillera Metropolitan District and the CPOA appealed the Director's interpretation to the Eagle County Board of County Commissioners. On October 11, 2016 the Board passed Resolution No. 2016-079, affirming the Director's interpretation with certain modifications. ECF No. 48-5 (also hearing Ex. I). The Resolution is apparently the subject of two pending legal challenges in state court under Rule 106 of the Colorado Rules of Civil Procedure. ECF No. 48-4 at ¶11.

In her affidavit Ms. Ross states that she expects the Lodge to be completely or substantially closed on February 28, 2017. ECF No. 48-3 at ¶7. Thereafter it will no longer be

open to the public or to Cordillera residents. *Id.* During the preliminary injunction hearing BHC indicated that the Lodge would be closed on that date regardless of the outcome of the hearing.

Plaintiffs filed this lawsuit on December 7, 2016. They assert claims sounding in fraud, promissory estoppel, and breach of an implied covenant that the Lodge would remain as a lodge, accessible to plaintiffs and other Cordillera property owners. ECF No. 37. On behalf of themselves and a purported class, they seek judicial declarations (1) that there is an implied and enforceable restrictive covenant that requires that the Lodge continue to exist as a Lodge, accessible to plaintiffs and those similarly situated upon their compliance with the terms and conditions for use set of the Lodge's owner; (2) that the Eleventh Amendment to the PUD is null and void to the extent of the modifications that allowed the Lodge to be eliminated and to be replaced by any of the 33 proposed new uses for the Lodge Parcel; and (3) that henceforth any modification that would allow the Lodge to be eliminated and replaced by any of the 33 other uses must first be presented to and approved by the members of the CPOA. Plaintiffs also seek corresponding injunctive relief and an award of compensatory damages exceeding $100 million. ECF No. 37 at 29-30.

The problem that precipitated the motion for a preliminary injunction was the imminent closing of the purchase contract between BHC and CCG. Plaintiffs asserted that BHC would not reveal when the contract would close other than to agree that it would not happen before February 17, 2017, the day after the scheduled preliminary injunction hearing. ECF No. 34 at 3. Fearing that they would be unable to prevent the closure of the Lodge and its conversion into a treatment facility if the purchase agreement closed, plaintiffs asked the Court to enjoin the

closing pending a final determination on the merits or at least for 60 days so that they could obtain discovery and attempt to establish their entitlement to summary judgment. *Id.*

Near the beginning of the hearing, before receiving any evidence or argument, I asked the defendants whether they might be willing to agree to plaintiff's request for a 60-day postponement of the closing. They declined, as was their right, and the hearing proceeded.

## JURISDICTION

One of the named plaintiffs (Schmeiser) represents that he is a citizen of Colorado residing at his home in Cordillera. The other three named plaintiffs, although also owners of homes in Cordillera and members of the CPOA, represent that they are citizens of Florida (Wilner and Letschert) and the District of Columbia (Rudnick). Plaintiffs allege that the individual defendants associated with BHC (Behringer and Cohen) are citizens of Texas, and that BHC and Behringer Harvard Holdings, LLC are incorporated in Delaware and have their principal places of business in Texas. ECF No. 37 at 5-6. Although not entirely clear, it appears that the CCG intervenors are probably citizens of Maryland. *See* ECF No. 1 at 6, ¶9.

This Court has jurisdiction pursuant to the Class Action Fairness Act of 2005, specifically 28 U.S.C. § 1332(d)(2). This is a purported class action in which the matter in controversy exceeds the sum or value of $5,000,000 and in which at least one member of the class of plaintiffs is a citizen of a State different from any defendant.

## PRELIMINARY INJUNCTION STANDARD

To succeed on a motion for a preliminary injunction, the movant must demonstrate the following four factors:

> (1) a substantial likelihood of success on the merits of the case; (2) irreparable injury to the movant if the preliminary injunction is denied; (3) the threatened

injury to the movant outweighs the injury to the other party under the preliminary injunction; and (4) the injunction is not adverse to the public interest. *Kikumura v. Hurley*, 242 F.3d 950, 955 (10th Cir. 2001). "[B]ecause a preliminary injunction is an extraordinary remedy, the movant's right to relief must be clear and unequivocal." *Dominion Video Satellite, Inc. v. Echostar Satellite Corp.,* 356 F.3d 1256, 1260 (10th Cir. 2004) (internal quotation marks omitted).

In the past the Tenth Circuit imposed a lesser burden of establishing likelihood of success on the merits in cases where the plaintiff makes a strong showing on the hardship factors. *See, e.g., Davis v. Mineta,* 302 F.3d 1104, 1111 (10th Cir. 2002) ("If the plaintiff can establish that the latter three requirements tip strongly in his favor, the test is modified, and the plaintiff may meet the requirement for showing success on the merits by showing that questions going to the merits are so serious, substantial, difficult, and doubtful as to make the issue ripe for litigation and deserving of more deliberate investigation.") (internal quotation marks omitted). Recent decisions, however, suggest that the more lenient standard for showing success on the merits likely is no longer recognized. *See Dine Citizens Against Ruining our Environment v. WPX Energy Production, LLC,* 839 F.3d 1276, 1282 (10th Cir. 2016) ("Under *Winter* [*v. Natural Resources Defense Council,* 555 U.S. 7, 22 (2008)]'s rationale, any modified test which relaxes one of the prongs for preliminary relief and thus deviates from the standard test is impermissible.");  *see also Planned Parenthood Ass'n of Utah v. Herbert,* 839 F.3d 1301, 1310 (10th Cir. 2016) (Gorsuch, J., dissenting from denial of rehearing en banc); *Planned Parenthood Ass'n of Utah v. Herbert,* 828 F.3d 1245, 1267–68 (10th Cir. 2016) (Bacharach, J., dissenting).

## ANALYSIS

### A. <u>Likelihood of Success on the Merits.</u>

Plaintiffs supported their request for a preliminary injunction with the declarations of plaintiffs Jane Wilner and Elise Micati. In addition they presented a declaration of Jeffrey Hartman, formerly the Design Review Coordinator for the CPOA, testimony at the hearing by Thomas Wilner, and several exhibits.

In her declaration Ms. Wilner states that "[w]e were told that [BHC] planned to expand the Lodge and its services by enlarging the hotel and building casitas on the property," and that the proposed amendment to the PUD was designed to "obtain the authority to do that." ECF No. 34-4.[2] She further states that, in order to obtain the necessary approvals of the amendments to the PUD by the County and the CPOA, representatives of BHC represented that the modifications "[did] not introduce new or additional density or uses or otherwise substantively change the Existing PUD." *Id.* at 12. "[BHC] never represented or implied that its proposed modification could allow the Lodge to be eliminated or replaced by any of the uses it listed in its proposed modifications to the exclusion of me and the Cordillera community." *Id.* at ¶13. She states that the CPOA approved BHC's proposed modifications in reliance on BHC's representations. *Id.* at ¶14.

Elise Micati indicates that she was the President of the CPOA at the time. Declaration, ECF No. 34-5, at ¶2. She adds certain details to Ms. Wilner's story, i.e.: (1) from June through

---

[2] Ms. Wilner purports to speak not only for herself but also for other Cordillera property owners. However, I am aware of no basis on which she is authorized to speak either for the CPOA or any other resident. I accept the declaration with that limitation.

October, 2009 she met many times with representatives of BHC; (2) it was represented that BHC planned to invest substantial money to expand the Lodge and to include fractional timeshare units; (3) the modifications of the PUD would allow that to happen; (4) the CPOA saw no downside to the proposal because BHC provided assurance that the amendment "would make no substantive changes to the existing PUD and would not affect adjoining property owners because it would not affect the overall density that was already permitted. *Id.* at ¶4. She points to the November 11, 2009 cover letter transmitting the proposed amendments to the County. Ex. E. She states that the letter, written by BHC's counsel, summarizes the same assurances that BHC gave to the CPOA and on which the CPOA relied. *Id.* Ms. Micati acknowledges that the amended PUD permits the Lodge Parcel to be used for "Medical Offices/Facilities" but states that this was intended to allow medi-spa type cosmetic services. *Id.* at ¶5.

The declaration of Jeffrey Hartman, CPOA's Design Review Coordinator in 2009, indicates that he participated in all of the meetings with BHC on behalf of the CPOA. ECF No 34-6 at ¶1. He states that BHC wanted to combine the Lodge Parcel and the Village Parcel into a single parcel for development purposes so that the allowable development densities could be shifted between them. *Id.* at ¶4. However, BHC represented that this would not affect adjacent property owners because the uses would remain the same. *Id.* He adds that BHC never suggested that the amendment would authorize the owner to eliminate the Lodge. *Id.* at ¶6. He confirms the November 11, 2009 letter from BHC's counsel to the County accurately summarizes BHC's representations to the CPOA as well. He expresses the opinion that BHC wanted to provide cosmetic, spa-type procedures consistent with the use of the facility as a spa. *Id.* at ¶7.

The latter is speculation, but that is not the primary problem with the Hartman declaration. Thomas Wilner, the husband of plaintiff Jane Wilner (and a lawyer of counsel to the New York law firm of Shearman & Sterling, LLP), testified that he drafted the affidavit following telephone conversations with Mr. Hartman. It was an expansion of an affidavit Mr. Hartman had given for the proceedings before the County. Mr. Hartman said that it was fine and signed it. But at the hearing BHC produced a second declaration ("affidavit") from Mr. Hartman. Affidavit of Jeffrey Hartman (Feb. 14, 2017), Ex. Z. In a letter to Mr. Wilner attached to the second affidavit Mr. Hartman states that he had been doing further thinking and research about the things they had discussed on the phone. "Having felt pressured, and feeling like you put words in my mouth about the changes made in 2009, I'd like to now express these thoughts and have them added to my declaration." *Id.*

Mr. Hartman now states that the original idea was for the Lodge to provide a "boutique" style of medical facility where individuals could obtain cosmetic procedures without "prying eyes." BHC representatives also talked about a facility that could provide shoulder or knee surgeries for people who were injured skiing, "a Steadman Hawkins kind of experience."[3] BHC representatives expressed their intent to move density to the Lodge Parcel to be able to create a "fractionalized entity." In Mr. Hartman's opinion, the new owner (CCG) and proposed new use of the Lodge Parcel "isn't out of that realm" and wouldn't violate the PUD. It would fractionalize the rooms to "sell" for $65,000 for 28 days according to a medical report. He says that, contrary to the fears of some, he doesn't believe there will be an influx of "crackheads and junkies," because people who can afford the treatment will more likely be "Beverly Hills moms

---

[3] The Steadman Clinic, formerly Steadman Hawkins Clinic, is a well-known orthopedic care center with facilities in Vail, Colorado and other places.

who are addicted to pain pills," and they might even buy property in Cordillera after being exposed to it. He adds that he does not believe that closing public access to the Lodge will be a big loss, noting that he often was the only person in the gym or the restaurant, and that he could count on one hand the number of times his Public Safety group had to monitor parking for a special event during the eight years he was there. *Id.*

During the hearing Mr. Wilner expressed dismay at the second Hartman affidavit, suggesting that something must have happened after the first affidavit to cause these second thoughts. He tried to reach out to Mr. Hartman but did not hear back from him. I am not suggesting that anyone acted in bad faith. But, the letter attached to the second affidavit plainly diminishes the force of Mr. Hartman's original declaration. Unlike the original declaration, the letter is written in his own words.

At bottom, however, none of these declarations is convincing. The notion that the 2009 amendments to the PUD permitted the closure of the Lodge is simply wrong. The Cordillera Declaration has authorized the owner to shut down the Lodge since 1993, give or take. And the proposed amendments listed 33 new standalone uses that would be authorized for the Lodge Parcel, including such things as retail commercial, professional offices, and residential uses. While the prior PUD stated that the only permitted use was a "Clubhouse and Lodge building or building with related facilities including but not limited to" nine types of facilities enumerated (a) through (i), the amendments deleted the "including but not limited to" language and numbered the "Clubhouse and Lodge" option (1), the next type of facility (2), and so on, including two dozen new uses from the Village Parcel. Ex. E at 13. Tom Ragonetti, BHC's lead counsel during the amendment process in 2009, testified at the preliminary injunction hearing

11

that the CPOA received and commented on drafts of the proposed amendments. Indeed, on October 19, 2009 the CPOA, after "review by the Board and upon the advice of staff and legal counsel," expressly approved the changes set forth in the Eleventh Amendment to the PUD. A Resolution Approving the Cordillera Subdivision Eleventh Amended and Restated Planned Unit Development Guide, Ex. A.

One authorized new use was for non-critical medical care "including, *without limitation*, for outpatient plastic surgery and other cosmetic procedures." Ex. E at 13 (emphasis added). It is undisputed that the final wording of that authorized use was proposed by the CPOA and accepted by BHC. During the hearing plaintiffs' counsel advised the Court that plaintiffs are not claiming that the treatment facility contemplated by CCG does not fit within the amended PUD's description of a "medical facility."

Moreover, during the preliminary injunction hearing plaintiffs' counsel (and Mr. Wilner in his testimony) informed the Court that plaintiffs do not object to placement of an addiction treatment facility on the Lodge Parcel. Plaintiffs distinguish themselves from certain individuals who apparently, in earlier protests, objected to having addicts in their midst. They also submitted a CPOA notice to homeowners which emphasized that persons with disabilities are welcome in Cordillera. Update on Pending Sale of Lodge and Spa at Cordillera (Aug. 19, 2016), Ex. 1. Despite the broad declaratory relief sought in the Second Amended Complaint, plaintiffs indicated that they would be fine with an agreement or court order that a portion of the Lodge would be maintained as a lodge with amenities available to the homeowners and the public. But the Court has no basis to order that in the face of the Cordillera Declaration.

Plaintiffs emphasize certain statements in the previously mentioned cover letter of November 11, 2009. ECF No. 34-1. In that letter counsel represented to the County, among other things, that its intent was "to address certain 'clean-up' items in the Existing PUD," and that "[t]he Amendment does not introduce new or additional density or uses to the Existing PUD, or otherwise substantively change the Existing PUD." ECF No. 34-1 at 1. The letter does note that the amendment would make densities and permitted uses the same for the Lodge and the Village Parcels. "This treatment reflects existing development and the contemplated completion of the Lodge at Cordillera." *Id.* Plaintiffs particularly call my attention to a statement in the letter that "[t]he Amendment will not have any effect on adjacent properties because it does not change the overall uses or densities currently contemplated in the Existing PUD." *Id.* at 3.

For the most part these statements are accurate. I do not agree with counsel's opinion that the amendments would not have an effect on adjacent properties. The amendments did not have an immediate effect in 2009, and if BHC's efforts to upgrade the Lodge and make it profitable had succeeded in the following years, we probably would not be here. But by permitting 33 new uses of the Lodge Parcel the amendments facilitated the sale of the Lodge to a buyer that will convert the Lodge to a high-end treatment facility. That affects adjacent properties. Counsel's statement was, in my view, careless at best.

But the impact of the statement is mitigated by several facts: (1) the letter was sent to the County, not these plaintiffs; (2) the remainder of the letter and the proposed changes to the PUD made it clear that many new uses would now be permitted for the Lodge Parcel; (3) the CPOA, after consulting counsel, approved the proposed amendments before this letter was even sent, Ex.

A; and (4) the Cordillera Declaration permitted BHC to close the Lodge entirely regardless of the amendments.

In sum, for purposes of a preliminary injunction, I cannot find that plaintiffs have established a likelihood of ultimate success on the merits of any of their claims for relief to the extent that the ultimate relief sought is an injunction or declaration requiring the continued existence of the Lodge as a lodge accessible to the plaintiffs; or nullification of the Eleventh Amendment to the PUD; or requiring a new vote of the CPOA on the 2009 modifications to the PUD. As I will discuss next, I do not find that plaintiffs have made a sufficiently strong showing on the other three preliminary injunction factors to sustain the likelihood of success element even if the Tenth Circuit still recognized the more relaxed showing.

### B. Irreparable Harm to the Movants.

When the Lodge was constructed it was a beautiful facility, consisting of a high-end hotel, a restaurant, indoor and outdoor pools, whirlpools, steam baths, saunas, a gymnasium, and a spa. Declaration of Jane Wilner, ECF No. 34-4, at ¶3. Ms. Wilner states that the Lodge was critical to her decision of purchase a home in Cordillera. *Id.* at ¶5. I have no reason to doubt the sincerity of that statement. Nor do I doubt that the Lodge was a part of what made buying a home in Cordillera attractive to others as well. The loss of this amenity as a prominent feature of the community causes harm to the plaintiffs and other residents whether or not they frequently use the facility. I acknowledged that harm early in the hearing.

When I had an opportunity to receive the parties' arguments and evidence, however, which helped to clarify the written materials that I had only had a brief opportunity to review before the hearing, it became evident to me that the plaintiffs could not establish irreparable

harm. The primary problem is the one I identified above in discussing likelihood of success on the merits. BHC has the right under the Cordillera Declaration to shut down the Lodge. BHC presented unrefuted (and probably irrefutable) evidence that it intends to close the Lodge on February 28, 2017, because the Lodge continues to lose money. I know of no authority that would permit me to force BHC to continue to operate the Lodge in the face of that Declaration.

Plaintiffs' claim of irreparable harm, therefore, must focus not on the closure of the Lodge as such but on harm that will be caused by converting the former Lodge into a high-end addiction treatment facility. However, plaintiffs did not provide any evidence that the creation of such a facility on the Lodge Parcel would cause them harm. On the contrary, as I noted above, they do not object to construction of the treatment facility so long as at least a portion of the Lodge is maintained as a lodge.

But plaintiffs did not show that keeping the Lodge open and sharing the building with the contemplated treatment facility was a realistic objective. The uncontradicted evidence is that BHC is unwilling to continue to operate a lodge at Cordillera. It has spent the last several years and substantial funds trying to increase the profitability of the Lodge, without success. It was unable to find a buyer of the Lodge who would maintain it as a lodge. Indeed, it found only one buyer, and at that, it was a buyer who paid only a fraction of what BHC had invested in the property. CCG is unequivocally unwilling to maintain the Lodge as a public lodge in whole or in part.

Accordingly, the Court finds that plaintiffs did not show, much less make a strong showing, that they would suffer irreparable harm if the closing of the purchase contract were not enjoined. If plaintiffs have any remedy, it is a damages remedy.[4]

### C. Injury to Other Persons.

CCG agreed to purchase the Lodge parcel in April 2016. Nordheimer Affidavit, ECF No. 48-4, at ¶16. As indicated above, in July 2016 Eagle County's Community Development Director issued his "letter of interpretation" in which he determined that the proposed use of the Lodge Parcel was consistent with the PUD. This was formally affirmed by the Board's resolution of October 11, 2016.

According to Ms. Ross, "[i]f the Pending Sale is enjoined, it is likely to force BHC into bankruptcy, a loan default, or insolvency." ECF No. 48-3 at ¶11. According to Mr. Nordheimer, CCG is now nine months into a 21-month development schedule. During that time CCG has incurred substantial expense to complete full architectural design and construction drawings and to prepare and submit applications for a building permit and Colorado state licenses. It has made job offers to 16 individuals, 10 of which have been accepted by people, at least some of whom are relocating to Colorado. Mr. Nordheimer states that if CCG cannot close on the purchase contract, its ability to close on its financing for the project and the entire development plan will be put in jeopardy. ECF No 48-4 at ¶¶4-8.

---

[4] Although damages are not before me now, plaintiffs should be aware of another potential hurdle that could affect their damages claim. To establish fraud under Colorado law, a plaintiff generally must prove that he or she justifiably relied on the misrepresentation. *See, e.g., M.D.C./Wood, Inc. v. Mortimer*, 866 P.2d 1380, 1382 (Colo. 1994). That is also an element of a promissory estoppel claim. *See, e.g., Kiely v. St. Germain,* 670 P.2d 764, 767 (Colo. 1983).

I am not convinced that all the dire calamities described by Ms. Ross and Mr. Nordheimer and Ms. Ross would befall their respective companies if the closing of the purchase contract were postponed 60 days. A large project like this gains momentum, and I expect that these corporate entities would find a way to keep the project alive while the plaintiffs were taking a few depositions and trying to shore up their legal position. Nevertheless, it is reasonable to assume that a 60-day stay of the closing of the purchase agreement would cause some expense to both sets of defendants. Plaintiffs provided no evidence to the contrary.

On balance, I find that while the likelihood of harm to the defendants if the closing were postponed is probably not great, plaintiffs did not show that harm to them would outweigh such harm.

### D. Public Interest.

Mr. Nordheimer, in his affidavit and his testimony, emphasized the need for more addiction treatment facilities throughout the nation, including in Colorado. *See, e.g.,* ECF No. 48-4 at ¶13-14. Plaintiffs did not attempt to dispute these representations, and I will assume for present purposes that the need is there. There was no evidence, however, that the need for a luxury center in Eagle County, Colorado is so urgent that a 60-day delay would significantly adversely affect the interest of potential clients or the public in general. I find that this is not a significant factor in the evaluation of the motion for a preliminary injunction. The decision is driven by the other factors discussed above.

DATED this day 2nd day of March, 2017.

BY THE COURT:

_____

R. Brooke Jackson
United States District Judge